## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

United States of America,

v.

Raymond Head,

        Defendant.

No. 23 CR 00450-1

Honorable Nancy L. Maldonado

### Memorandum Opinion and Order

Defendant Raymond Head is charged pursuant to 18 U.S.C. § 922(g)(1) with unlawfully possessing a firearm after being convicted of a felony. Pending before the Court is Head's motion to dismiss the indictment. (Dkt. 21.) Head argues that § 922(g)(1) is unconstitutional under the Second Amendment, applying the United States Supreme Court's analytical framework in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). For the reasons stated in this Memorandum Opinion and Order, the Court rejects Head's arguments and concludes, as have a majority of courts to address the issue, that § 922(g)(1) is constitutional on its face and as applied to Head's conduct. Head's motion is therefore denied.

### Factual Background

According to the Government, the evidence in this case will show that, on March 21, 2023, Chicago Police Department ("CPD") officers were dispatched in response to a 911 call that a man with a firearm was seen chasing another individual. (Dkt. 24 at 3.)[1] CPD officers arrived at the scene and identified Head as the subject of the 911 call. (*Id.*) Upon seeing the CPD Officers, Head attempted to flee, but he was apprehended and found in possession of a firearm. (*Id.*) Head's

---

[1] In citations to the docket, page numbers are taken from CM/ECF headers.

1

girlfriend would call 911 later that same day to report that Head had stolen her registered firearm from her home. (*Id.* at 4.)

The Government asserts that Head was prohibited from possessing a firearm under the felon dispossession statute, 18 U.S.C. § 922(g)(1). It is undisputed for purposes of the present motion that, at the time of his arrest, Head's criminal history included multiple felony convictions under Illinois law, including aggravated domestic battery, possession of a firearm by a convicted felon, mob action, and manufacturing or delivering between 10 and 30 grams of cannabis. (Dkt. 21 at 2; Dkt. 27 at 4.)

On August 15, 2023, a grand jury returned an indictment charging Head with one count of unlawfully possessing a firearm as a felon in violation of § 922(g)(1). (Dkt. 1.) Head was transferred from the Illinois Department of Corrections into federal custody and initially appeared before a magistrate judge on August 29, 2023, who appointed counsel from the Federal Defender Program and ordered Head detained after he waived his right to a detention hearing without prejudice. (Dkt. 14.)

Head now moves to dismiss the indictment on the grounds that the felon dispossession statute is unconstitutional, both on its face and as applied to his conduct.[2] As with many similar motions brought by federal criminal defendants in this District and across the nation, Head contends that § 922(g)(1) is unconstitutional under *Bruen*.

### Legal Standard for Motion to Dismiss

The Court construes Head's motion as brought pursuant to Federal Rule of Criminal Procedure 12(b)(1), which provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P.

---

[2] As discussed further below, Head's briefing is somewhat unclear as to whether he intends to raise both an as-applied and facial challenge to § 922(g)(1). For the sake of completeness, the Court will address both.

12. "Rule 12 authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds." *United States v. Vaughns*, No. 22-CR-00636, 2023 WL 8258575, at *1 (N.D. Ill. Nov. 29, 2023) (citing *United States v. Coscia*, 866 F.3d 782, 790 (7th Cir. 2017)). In deciding a motion under Rule 12, the Court assumes that the indictment's factual allegations are true and must "view all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999). Further, the Court may decide any questions of law raised in the motion, "including the constitutionality and interpretation of a federal statute." *Vaughns*, 2023 WL 8258575, at *1 (citing *United States v. Sorich*, 523 F.3d 702, 706 (7th Cir. 2008)).

## Discussion

The Court will begin its discussion by setting forth the relevant Second Amendment legal framework, including *Bruen* and the more recent caselaw applying it. The Court will then turn to the merits of Head's motion and apply the *Bruen* test to § 922(g)(1). Ultimately, as set forth below, the Court concludes that § 922(g)(1) is constitutional on its face and as applied to Head, and therefore denies Head's motion to dismiss the indictment.

## I. Second Amendment Jurisprudence

### A. Controlling Precedent from the Supreme Court and Seventh Circuit

The Second Amendment to the United States Constitution provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In 2008, the Supreme Court held that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). The Court cautioned that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."

*Id*. at 626. And the Court went on to explicitly warn that its opinion "should not be taken to cast doubt" on a number of different categories of firearms regulations, including "longstanding prohibitions on the possession of firearms by felons." *Id.*

In the years following *Heller*, there has been a constant stream of constitutional challenges to federal, state, and local gun regulations, and federal district courts and circuit courts of appeals have struggled with the appropriate standards of review to apply in those challenges. Most federal courts, including the Seventh Circuit, eventually landed on a two-step means-end scrutiny test similar to the framework used in First Amendment cases. *See generally Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) (describing the two-step framework).

The Supreme Court, however, put an end to these means-end scrutiny tests with its 2022 decision in *Bruen. See* 597 U.S. at 17. There, the Court announced a new analytical framework for cases involving Second Amendment challenges to firearms regulations: first, the court hearing the challenge must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* If not, the inquiry ends, and the challenged regulation is constitutional. But if the conduct falls within the plain text of the Second Amendment, it is presumptively protected. *Id.* The analysis then moves to the second step, where the government bears the burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 18–19. As will be discussed further below, this second step entails a historical inquiry into potentially analogous firearms laws of the past, in order to determine "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29. Critically, the court explained that the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*," in order to meet its burden that the challenged regulation

is within the nation's historical tradition of firearm regulation. *Id.* at 30 ("[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.").

Since *Bruen* was decided, the Seventh Circuit has provided further guidance to district courts on how to apply *Bruen's* text-and-history analysis. *See Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023). *Atkinson* itself also involved a challenge to the felon dispossession statute at issue here, § 922(g)(1), though the Seventh Circuit declined to reach the ultimate issue of whether the statute is constitutional. *Id.* Instead, given that *Bruen* had been decided while the case was on appeal and was not adequately addressed by the parties, the Seventh Circuit remanded the case to the district court for "a proper, fulsome analysis of the historical tradition supporting § 922(g)(1)" under *Bruen*. *Id.* The court provided additional guidance to the lower courts regarding the application of *Bruen*, and the means by which the government can meet its burden to demonstrate that a regulation is consistent with the nation's tradition of firearm regulation. In particular, the Seventh Circuit, quoting *Bruen*, emphasized that the government can "reason by analogy," and need not point to a "dead ringer" from history in order to justify a modern firearm regulation. *Id.* at 1021 (citing *Bruen*, 597 U.S. at 30.) On the other hand, the court cautioned that the government could not justify a regulation under *Bruen* by pointing to "only a couple of isolated historical facts and incidents, offering no detail about their application and import." *Id.* at 1023.

Ultimately, the Seventh Circuit set forth five questions to "help focus the proper analysis on remand" of the constitutionality of § 922(g)(1):

1.  Does § 922(g)(1) address a 'general societal problem that has persisted since the [eighteenth] century?' If this problem existed during a relevant historical period, did earlier generations address it with similar or 'materially different means?';

2.  What does history tell us about disarming those convicted of crimes generally

5

and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction imposed by § 922(g)(1). To answer the question, the district court and the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against § 922(g)(1);

3. Are there broader historical analogues to § 922(g)(1) during the periods that *Bruen* emphasized, including, but not limited to, laws disarming 'dangerous' groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to § 922(g)(1);

4. If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible;

5. If history supports *Atkinson's* call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen* shows that these distinctions should also have firm historical support. *See* 142 S. Ct. at 2132–33 (explaining that the court must assess whether modern and historical regulations are 'relevantly similar,' including in terms of how and why the regulations burden gun rights).

*Id.* at 1023–1024.

While the Seventh Circuit declined to reach the constitutionality of § 922(g)(1) in *Atkinson*, a more recent decision from the court issued just this past month suggests that convicted felons on parole may not fall under the protection of the Second Amendment at all. *See United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024). Gay was convicted under § 922(g)(1) and challenged his conviction on appeal by arguing that the Second

6

Amendment permitted persons with felony convictions like himself to possess firearms. *Id.* The court observed that Gay's argument was "hard to square" with the language from *Heller* that "longstanding prohibitions on the possession of firearms by felons" remain valid, and it further commented that this same statement remains true after *Bruen*. *Id.* ("Justices Alito and Kavanaugh, whose votes were essential to the majority, wrote separately to say that *Bruen* did not change anything about *Heller*.") (citing *Bruen*, 597 U.S. at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm . . . Nor have we disturbed anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns."). The court nonetheless assumed "for the sake of argument that there is *some room* for as-applied challenges" to § 922(g)(1) but then rejected any such challenge from Gay. *Id.* at 846–847. In particular, the court concluded that Gay did not fit the description of a "law-abiding, responsible citizen"—the Supreme Court's description of who possesses rights under the Second Amendment—because he had been convicted of 22 felonies and was on parole when he was arrested for having a firearm in violation of § 922(g)(1). *Id.* The court thus concluded that, given his criminal history and the fact he violated the statue while on parole, Gay was "not a 'law-abiding, responsible' person who has a constitutional right to possess firearms," and therefore the court rejected his attempt to challenge his conviction under § 922(g)(1). *Id.*

### B. Other Post-*Bruen* Authority on the Constitutionality of § 922(g)(1)

In addition to the above controlling authority, the Court also must acknowledge the significant amount of persuasive authority, from this District and across the nation, that has developed with respect to the constitutionality of § 922(g)(1). There has been a wave of challenges

to the felon dispossession statute since *Bruen*, and as the Government points out, the overwhelming majority of courts that have considered the issue, including the majority of those in this District that have faced the question, have concluded that § 922(g)(1) remains constitutional after *Bruen*. *See generally United States v. Barwicks*, No. 20-CR-00563, 2024 WL 1521473, at *4 (N.D. Ill. Apr. 8, 2024) (discussing weight of authority and citing to a Government exhibit listing 360 different district court rulings across the country finding § 922(g)(1) constitutional under *Bruen*).[3] These courts include two circuit courts of appeals (the Eighth Circuit and Tenth Circuit), and at least 10 judges in this District. *United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023); *Vincent v. Garland*, No. 21-4121, 2023 WL 5988299 (10th Cir. Sept. 15, 2023); *see also* (Dkt. 27 at 10 n. 4) (collecting cases from this District).

Of course, not every court has upheld the constitutionality of § 922(g)(1). The Third Circuit, sitting en banc, held last year that the statute was unconstitutional as applied to an individual with a state law misdemeanor conviction for making a false statement to obtain food stamps. *See Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 98 (3d Cir. 2023).[4] The court there emphasized that its decision was a "narrow one" limited to the circumstances before it, as the government had failed to meet its burden to demonstrate the nation had a longstanding history of depriving people like the defendant, with his particular conviction for making a false statement, of their firearms. *Id* at 106. And more recently, two courts within this District have more broadly found § 922(g)(1) unconstitutional on its face. *See United States v. Prince*, No. 22-CR-240, 2023

---

[3] In the short time since the Government filed its response brief—which cites to the same 360 number noted by the court in *Barwicks*—a number of additional courts in this District, and in the Seventh Circuit generally, have ruled that the felon dispossession statute is constitutional. *See id.* at n.8 (collecting recent cases); *see also, e.g.*, *United States v. B. Johnson*, No. 20-CR-926, 2024 WL 2019541, at *2 (N.D. Ill. May 6, 2024); *United States v. Pierce*, No. 3:23-CR-30046-DWD, 2024 WL 1554835, at *1 (S.D. Ill. Apr. 10, 2024); *United States v. Davis*, No. 22-CR-210-JPS, 2024 WL 490581 (E.D. Wis. Feb. 8, 2024).

[4] Though the state classified the crime as a misdemeanor, it carried a potential penalty of up to five years in prison, which meant it qualified as a felony for the purposes of § 922(g)(1).

WL 7220127 (N.D. Ill. Nov. 2, 2023) (Gettleman, J.); *United States v. Neal*, No. 20 CR 335, 2024 WL 833607, at *12 (N.D. Ill. Feb. 7, 2024) (Ellis, J.).[5] In *Prince*, which Head urges this Court to follow, the court concluded that the government's proffered historical analogues failed to satisfy its burden "to show a history and tradition of 'relevantly similar' analogues to § 922(g)(1)'s permanent, categorical firearm dispossession of all felons." *Prince*, 2023 WL 7220127, at *11. The court in *Neal* similarly concluded that the "lack of a distinctly similar regulation from the founding era prohibiting felons from possessing firearms means that § 922(g)(1) cannot pass constitutional muster, at least for now." *See Neal*, 2024 WL 833607, at *12.

As will be explained further in the following sections, the Court respectfully disagrees with the reasoning of *Prince, Neal*, and those other courts that have found § 922(g)(1) unconstitutional. Instead, this Court joins the majority of other courts in this District and across the country and finds that that § 922(g)(1) is constitutional under the framework articulated by *Bruen*, and as further explained by the Seventh Circuit in *Atkinson*.

## II. Plain Text Inquiry

With the above legal background in mind, the Court turns next to Head's challenge and the Court's analysis of the constitutionality of § 922(g)(1) under the *Bruen* framework. As stated above, the first question under *Bruen* is whether "the Second Amendment's plain text covers an individual's conduct." *Bruen* 597 U.S. at 17. Head argues that his conduct—the possession of a firearm by a person convicted of a felony—is covered by the plain text of the Second Amendment and is presumptively protected by the Constitution. (Dkt. 21 at 4; Dkt. 29 at 8–12.) The

---

[5] Since the *Prince* decision, Judge Gettleman has issued a number of other decisions coming to the same conclusion based on the same or similar reasoning. *See, e.g.*, *United States v. Hale*, 2024 WL 621614, at *3 n.1 (N.D. Ill. Feb. 14, 2024) (collecting cases). The Court also notes that another court in the Southern District of Illinois has similarly issued a number of decisions concluding that the statute is unconstitutional on its face and as applied. *See, e.g.*, *United States v. Brunner*, 2024 WL 1406190, at *5 (S.D. Ill. Apr. 2, 2024) (Yandle, J.).

Government, on the other hand, argues that felons do not fall within the category of "the people" protected under the Second Amendment, because the Second Amendment's protections historically extend only to "ordinary, law-abiding, adult citizens who are members of the political community." (Dkt. 27 at 16) (citing *Bruen*, 597 U.S. at 31; *Heller*, 554 U.S. at 580.)

There is no binding precedent on the question of whether the phrase "the people" as used in the Second Amendment's text includes convicted felons. The Seventh Circuit in *Atkinson* declined to reach the issue, allowing the government a chance to develop its argument on remand. 70 F.4th at 1024. District courts within the Seventh Circuit that have addressed the question are split. *See generally Barwicks*, 2024 WL 1521473, at *5 (discussing split in authority and collecting cases); *compare United States v. McKay*, No. 23 CR 443, 2024 WL 1767605, at *2 (N.D. Ill. Apr. 24, 2024) ("The 'people' of the Second Amendment are not dangerous felons, so the restriction of their rights to bear arms is not an infringement on the Constitution."), *with United States v. Washington*, No. 23-CR-00274, 2023 WL 8258654, at *4 (N.D. Ill. Nov. 29, 2023) ("The Court finds that the plain text of the Second Amendment covers all people—including a person convicted of a felony."). And while in *Gay* the Seventh Circuit expressed serious doubts as to whether felons could raise Second Amendment challenges to § 922(g)(1) at all, it made no express holding on the meaning of the phrase "the people" or whether felons were categorically excluded from Second Amendment protection. *See Gay*, 98 F.4th at 846–47. Instead, the court assumed that felons like Gay could bring an as applied challenge, but that his challenge in particular failed. *Id.*

The Government is correct that, first in *Heller* and then again in *Bruen*, the Supreme Court has repeatedly associated the right to bear arms in the Second Amendment with "law-abiding" citizens. *See id.* at *3 ("When describing the persons who possess rights under the Second Amendment, *Bruen* repeatedly used the phrase 'law-abiding, responsible citizens' or a variant.")

(citations omitted). But as other courts in this District have observed, "neither *Heller* nor *Bruen* involved the issue of felons, much less the issue of the Second Amendment's textual scope as it applies to felons." *Barwicks*, 2024 WL 1521473, at *6 ("So, while the Supreme Court in both cases referred to law-abiding citizens in discussing the Second Amendment's scope, it did not hold in either case that 'the people' was limited to law-abiding people"); *United States v. Gates*, No. 1:22-CR-00397-1, 2023 WL 5748362, at *4 (N.D. Ill. Sept. 6, 2023) ("Each reference to 'law-abiding' citizens did not constitute part of a broader holding that felons are categorically not amongst the 'people' under the Second Amendment."). The "law-abiding citizens" language from the Supreme Court is thus not conclusive as to the scope or meaning of the phrase "the people" in the Second Amendment and does not resolve the question of whether it presumptively protects firearm possession by convicted felons. Indeed, the Seventh Circuit has previously explained (although in a pre-*Bruen* opinion) that "while some of *Heller*'s language does link Second Amendment rights with the notions of 'law-abiding citizens' and 'members of the political community,' those passages did not reflect an attempt to define the term 'people.'" *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015). Additionally, the Supreme Court in *Heller* separately stated that there is a "a strong presumption that the Second Amendment right is exercised individually and *belongs to all Americans*." *Heller*, 554 U.S. at 581 (emphasis added).

The Court therefore cannot conclude solely based on the "law-abiding citizen" language in *Heller* and *Bruen* that felons are categorically excluded from the protection of the Second Amendment. Instead, the Court must determine, based on general principles of interpretation, whether the phrase "the people" as used in the Second Amendment includes convicted felons. The Government, for its part, argues that legislatures historically had "wide latitude to exclude felons from the political community as a consequence of their convictions," including by depriving them

11

of the right to vote, to serve on juries, and to hold elected office. (Dkt. 27 at 16–17.) The Government thus maintains that § 922(g)(1) accords with the historical meaning of the Second Amendment by "imposing a firearms-related disability as a legitimate consequence of a felony conviction." (*Id.* at 17.) Head, on the other hand, responds by noting the "strong presumption" recognized in *Heller* that the Second Amendment right "belongs to all Americans." (Dkt. 21 at 5.) Head thus argues that historical evidence that the nation deprived felons of other rights, such as the right to vote or to serve on a jury, says nothing about whether the individual right under the Second Amendment could similarly be restricted. (*See* Dkt. 29 at 9–10.)

The Court is not convinced by the Government's argument and declines to read "the people" as used in the Second Amendment as categorically excluding felons. Instead, the Court concludes, as have many other courts in this District, that the better interpretation of the phrase "the people" as used in the Second Amendment is the one that comports with how the phrase is understood in other places in the Bill of Rights, including the First and Fourth Amendments. *See, e.g., Barwicks*, 2024 WL 1521473, at *7; *Gates*, 2023 WL 5748362, at *4; *United States v. R. Johnson*, No. 18 CR 00458, 2023 WL 6690388, at *3 (N.D. Ill. Oct. 12, 2023). As Judge Chang aptly explained when confronted with this same issue in *Gates*, if the Government's reading of the text of the Second Amendment were correct, then "all other constitutional-rights provisions that use the word 'people' would categorically remove felons outside of the protection of the pertinent right." 2023 WL 5748362, at *4. But this is not the case; the Fourth Amendment, for example, protects the rights of "the people" against unreasonable searches and seizures, and convicted felons like Head are not categorically excluded from this protection. *See id.* And the First Amendment protects the rights of "the people" to peaceably assemble, a protection that does not categorically exclude felons. *Id.* In short then, "since felons are not excluded from First or Fourth Amendment

rights, neither should they be excluded from Second Amendment rights, given the Framer's consistent use of the term 'the people' throughout." *R. Johnson*, 2023 WL 6690388, at *3.

The Government attempts to reconcile this tension created by their reading of the Second Amendment by contending that the phrase "the people" need not necessarily be interpreted consistently throughout Founding era constitutional text, because of the fundamentally different nature of the different rights. (Dkt. 27 at 22.) For example, the Government contends that reading "the people" as the same in the First and Second Amendments "ignores differences between the rights protected by the First and Second Amendments, as the exercise of rights under the First Amendment do not put at risk the physical safety of others." (*Id.*) (citation omitted). The Government further contends that rights under the Fourth Amendment belong to the "national community," that is, all the people, whereas the rights under the Second Amendment belong to, as the Supreme Court has described, the "political community." (*Id.*) The Government thus argues that the scope of the "people" can be understood differently depending on the context of the particular right at issue.

It is, of course, obviously true that the nature of the rights under each amendment is distinct. But the Court is not persuaded to read a categorical exclusion of felons into the Second Amendment, when felons are not so excluded from other amendments in the Bill of Rights that use the same phrase. In fact, the Supreme Court itself, in recognizing the individual right to bear arms in *Heller*, interpreted the phrase "the people" by looking, in part, at how the phrase was understood under the First and Fourth Amendments. *See Meza-Rodriguez* 798 F.3d at 669–70 ("*Heller* noted the similarities between the Second Amendment and the First and Fourth Amendments, implying that the phrase 'the people' (which occurs in all three) has the same meaning in all three provisions.") (citing *Heller*, 554 U.S. at 592); *see also Heller*, 554 U.S. at 580

(noting that "the people" is "a term of art employed in select parts of the Constitution," including the First, Fourth, Ninth and Tenth Amendments, and further stating that "the term unambiguously refers to all members of the political community, not an unspecified subset."). The Supreme Court therefore appears to have assumed, without expressly deciding, that the phrase "the people" is used consistently throughout the Bill of Rights. For this Court to read a categorical exclusion into the plain text of the Second Amendment that does not exist under other amendments would run counter to the Supreme Court's own apparent recognition that the term, the "people," has the same meaning throughout the Bill of Rights.

Finally, the Court recognizes that, under certain circumstances, felons may have reduced constitutional protections; for example, prisoners have no Fourth Amendment protections against searches of their cells, and individuals on post-incarceration supervised release may be subject to searches without probable cause. *See generally United States v. Agee*, No. 1:21-CR-00350-1, 2023 WL 6443924, at *5 (N.D. Ill. Oct. 3, 2023). But the question at this first step of *Bruen* is not whether the rights of felons have been historically limited in some ways in some circumstances, but rather whether felons as a class are categorically excluded from the plain text of the Second Amendment. The Court reads no such categorical exclusion in the plain text of the Second Amendment, and instead reads "the people" consistent with how it is used in the rest of the Bill of Rights, including the First and Fourth Amendments, which contain no such categorical exclusion of felons.

In sum then, the Court concludes that convicted felons are included under the definition of "the people" whose rights are protected by the Second Amendment. *See, e.g.*, *Barwicks*, 2024 WL 1521473, at *7 (concluding that felons are not categorically excluded under the Second Amendment, finding that "the examples cited by the Government of legal disabilities imposed on

felons (*i.e.*, to serve on a jury, vote, and hold elected office) do not outweigh the foregoing counterexamples from the Fourth and First Amendments when evaluating the Second Amendment's plain text[]"). Head's conduct of possessing a firearm while a convicted felon thus falls within the plain text of the Second Amendment and is therefore presumptively protected, unless the Government can satisfy their burden at step two of the *Bruen* analysis.

### III. Historical Tradition of Firearm Regulation.

Having found that the Second Amendment's plain text covers firearm possession by felons, and therefore presumptively protects Head's conduct, the Court turns next to the second inquiry under *Bruen*: whether the Government can show that the felon dispossession statute, § 922(g)(1), is consistent with this Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 18–19; *see Atkinson*, 70 F.4th at 1023–24.[6] Before reaching that issue, the Court must address two threshold issues raised in the parties' briefing: the lack of expert evidence and the appropriate standard for the Court's analysis of historical evidence.

### A. Expert Evidence

In his reply, Head notes in passing that the Government did not submit a declaration from an expert historian or seek to introduce expert testimony in support of its historical analysis. (Dkt. 29 at 4.) Head asserts this lack of expert testimony is "telling," and suggests a lack of a historical tradition supporting the Government's arguments. (*See id.*) (citing *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *31 (S.D. Miss. June 28, 2023) ("The most

---

[6] At least one court in this District has questioned whether the historical review established by *Bruen* and further developed by the Seventh Circuit in *Atkinson* remains necessary for § 922(g)(1) in light of the Seventh Circuit's more recent decision in *Gay*. *See B. Johnson*, 2024 WL 2019541, at *2 ("Given *Gay's* more recent analysis of Supreme Court precedent, however, a historical review now appears unnecessary in this case."). The court in *B. Johnson* nonetheless found, assuming a historical analysis was still necessary, that the Government had met its burden to justify § 922(g)(1). *See id.* Here too, the Court acknowledges that it is unclear exactly how the decision in *Gay* impacts the historical analysis discussed in *Bruen* and *Atkinson*, especially given that *Gay* does not mention the latter case. The Court will, however, assume that it still must follow the mandate of *Atkinson* and conduct the historical review of the Government's proposed analogues.

disappointing failure is that the party with the burden to prove history and tradition—the United States—did not designate a historian to testify on the analogues, if any, to modern felon-in-possession laws.") The Government, perhaps anticipating this criticism, argues in its responsive brief that the Court can analyze the historical sources without the assistance of an expert, because the *Bruen* historical inquiry is purely a question of law, not fact. (Dkt. 27 at 23 n.12.)

The Court agrees with the Government that no testimony (expert witness or otherwise) is necessary to resolve the present dispute. Head notably does not challenge the factual accuracy of any of the Government's historical sources or legislative citations; instead, he argues that the Government's sources do not demonstrate a historical tradition of disarming felons. (*See* Dkt. 29 at 14–36.) In the absence of any dispute over either side's historical sources, there is no need for expert testimony to guide the Court's analysis. Rather the Court can determine, as a matter of law, whether § 922(g)(1) is consistent with the historical tradition of firearm regulation based on the parties' sources as presented in their briefing.

## B. Applicable Standard for Historical Analysis

An additional threshold issue the Court must resolve is the appropriate standard that applies to the Court's consideration of historical evidence, and what kind of historical evidence the Government is required to muster to demonstrate that a regulation is consistent with the nation's history of firearm regulation. Head argues that the Government can only meet its burden under *Bruen* by pointing to "distinctly similar" historical regulations. (Dkt 29 at 6.) According to Head, the Supreme Court in *Bruen* established two separate avenues for analyzing the history of firearms regulations depending on whether the problem addressed by the relevant regulation existed at the Founding. (*Id.* at 6–7). If the challenged regulation "addresses a general societal problem that has persisted since the [eighteenth] century," then Head argues that the Government can only justify

its regulation by pointing to a "distinctly similar" regulation from the Founding that was enacted to address that same problem. (*Id.*) If, on the other hand, the modern regulation was motivated by "unprecedented social concerns or dramatic technological advances," such that the need for the regulation was "unimaginable at the founding," then the Court's historical inquiry is broader, and the Government can "reason by analogy" and point to laws that are "relevantly similar." (*Id.*)

Both sides here generally agree that that the felon dispossession statute addresses a societal problem that has persisted since the eighteenth century, though they each frame that problem in different ways: Head describes the statute as addressing the problem of "crime and recidivism" in general, (*id.* at 7), whereas the Government asserts that the law relates to the disarmament of individuals who are "untrustworthy adherents to the rule of law." (Dkt. 27 at 39.) But regardless of the framing, the fact that the same problems have persisted since the Founding would mean, at least according to Head, that the Government must meet a higher burden of pointing to a "distinctly similar" Founding-era regulation to justify § 922(g)(1). Head argues that the Government cannot meet this requirement because it does not cite to any historical laws restricting firearm possession by felons in particular. (Dkt. 29 at 17.) In fact, it appears, based on the evidence and sources cited by Head, that felon disarmament laws did not emerge until the early twentieth century. (*See id.*) (citing *e.g.*, Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009)).

The Court disagrees, however, with Head's reading of *Bruen* as creating an express two-tiered system of historical analysis. It is true that the Supreme Court in *Bruen* contemplated both "fairly straightforward" and "more nuanced" historical inquiries depending on whether the societal problem addressed by the challenged firearm regulation existed in the eighteenth century. *Bruen*, 597 U.S. at 26–27. But in contemplating this issue, the Supreme Court did not establish different

evidentiary standards, nor did it limit the types of evidence that lower courts can consider in determining whether a regulation is consistent with the Nation's history of firearm regulation. *See United States v. Calhoun*, No. 22-CR-00025, 2024 WL 36977, at *9 (N.D. Ill. Jan. 3, 2024) (rejecting the same argument in another challenge to § 922(g)(1)). The Supreme Court merely observed that the absence of a "distinctly similar" historical regulation might be "relevant evidence" of unconstitutionality, but it did not hold that such an absence is conclusive or dispositive of the question. *See id.* (citing *Bruen*, 597 U.S. at 26.).

A closer examination of *Bruen* demonstrates that there is no such express requirement that the Government point to "distinctly similar" regulations. *Bruen*, like this case, involved a challenged regulation that addressed a societal problem that has existed since the Founding: there, the problem of firearm violence in densely populated areas. *See* 597 U.S. at 27. Under Head's reading, the Supreme Court in *Bruen* should therefore have only analyzed whether the challenged New York regulation was "distinctly similar" to a Founding era regulation, and if not, ended its inquiry and found the regulation unconstitutional. But the Supreme Court did not limit its analysis in that manner. Instead, it embarked on what it described as a "long journey through the Anglo-American history of public carry," analyzing and comparing the burdens imposed by the challenged law and those imposed by historical analogues cited by the Government. *See id.*; *see also Calhoun*, 2024 WL 36977, at *9 (citations omitted). In other words, the Supreme Court did not limit its historical inquiry to the "fairly straightforward" analysis of only looking for "distinctly similar" regulations, but instead conducted the broader analysis to identify "relevantly similar" historical analogues. *See Calhoun*, 2024 WL 36977, at *9 (observing that the Supreme Court only uses the phrase "distinctly similar" once in *Bruen*, whereas the phrase "relevantly similar" is used multiple times throughout the majority's extensive historical analysis).

In short, while the lack of a "distinctly similar" historical regulation banning firearm possession by felons might be relevant to the Court's historical analysis, it is not outcome determinative as Head suggests. Even if a challenged regulation addresses a societal problem that has existed since the Founding, the Government can still meet its burden to demonstrate the regulation is consistent with the Nation's history of firearm regulation by pointing to "relevantly similar" historical analogues. *See Bruen*, 597 U.S. at 30.

**C. Analysis of Government's Proffered Historical Analogues**

Having found that expert testimony is not required, and that the Government need not point only to "distinctly similar" firearms regulations from history, the Court turns next to the substantive question of whether the historical analogues cited by the Government demonstrate that § 922(g)(1) is consistent with this Nation's historical tradition of firearms regulation. As it has done in many other cases in this District involving challenges to the felon dispossession statute, the Government cites to two broad categories of laws as historical analogues to § 922(g)(1): (1) laws that "disqualify people categorically from possessing firearms based on a judgment that certain groups simply could not be trusted to adhere to the rule of law"; and (2) laws imposing capital punishment and forfeiture of estate as punishment for felonies. (*See* Dkt. 27 at 24, 35.); *see generally United States v. Jackson*, No. 20 CR 298, 2023 WL 7160921, at *7 (N.D. Ill. Oct. 31, 2023) (collecting cases from this District evaluating these two categories of historical analogues). The Court will examine each of the proffered analogues below. In so doing, it is important to again emphasize that *Bruen* requires "only that the government identify a well-established and representative historical analogue, not a historical *twin*." 597 U.S. at 30. The Court also considers

the guiding questions outlined by the Seventh Circuit in *Atkinson,* set forth above.

### 1. Historical Disarmament

As to the first category of historical evidence—firearm disqualification laws—the Government begins its argument by pointing to seventeenth-century English laws that disarmed Catholics who refused to make declarations renouncing their faith. (Dkt. 27 at 25–28) (citing, *e.g.* 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688)). In 1689, shortly after the Glorious Revolution of 1688, England passed a law disarming Catholics who refused to renounce their faith based on the belief that they could not be trusted to obey English law. (*See id.*); *see also Kanter v. Barr*, 919 F.3d 437, 456–57 (7th Cir. 2019) (Barrett, J., dissenting) (observing that the English Parliament disarmed Catholics who "threatened violence and the risk of public injury" and who the Protestant majority found "untrustworthy") (citing Adam Winkler, *Gunfight* 115 (2011)); *see also Range*, 69 F. 4th at 120–21 (Krause, J., dissenting) ("Following the tumult of the English Civil War, the restored Stuart monarchs disarmed nonconformist (i.e., non-Anglican) Protestants. . . . In 1689, the pendulum of distrust swung the other way. Parliament enacted a statute prohibiting Catholics who refused to take an oath renouncing the tenets of their faith from owning firearms."). The Government notes that these English laws did not disarm on the basis of a belief that Catholics as a group were dangerous, but rather the dispossession stemmed from the Protestant majority's belief that Catholics would have a propensity to disobey English law as enacted by the Protestant majority. (Dkt. 27 at 25); *see Agee*, 2023 WL 6443924, at *8 ("[T]he government here compellingly contends that this categorical dispossession stemmed from the distrust of those persons to obey English law at the time (determined during a time of Protestant rule)."). The Government thus maintains these English disarmament laws evidence an early historical tradition, carried through into the Founding era, of governments disarming groups on the belief they could

not be trusted to adhere to the rule of law. (*See* Dkt. 27 at 28) (citing *Atkinson*, 70 F.4th at 1031 (Wood, J. dissenting).

Head argues in response that the English statute disarming Catholics is a poor analogue for § 922(g)(1) because it did not impose a "comparable burden" on the rights protected under the Second Amendment. In particular, Head notes the English disarmament law allowed Catholics to retain their arms as long as they swore an oath of allegiance to the King, and further that it contained an exception for Catholics to obtain permission to possess firearms "for the defense of [their] House or person." (Dkt. 29 at 23–24.) Head further argues that the burden imposed by the law was not "comparably justified," because the English law was based on the Protestant majority's belief that Catholics were "seditious enemies of the state." (*Id.* at 24) (citing Clement Fatovic, *The Anti-Catholic Roots of Liberal and Republican Conceptions of Freedom in English Political Thought*, 66 J. Hist. Ideas 37, 43 (2005)) ("throughout the seventeenth century it was widely believed that closet Catholics throughout the country formed a deadly fifth column lying in wait to slaughter Protestants and force their religion on the nation . . ."). Head thus argues that the English law was not targeted at those who would not obey the law, as the Government suggests, but rather at preventing armed insurrection, which makes it a poor analogue for § 922(g)(1).

The Court agrees with the Government, as have other courts in this District, that these English disarmament laws cited by the Government serve as relevant historical analogues for § 922(g)(1). *See Agee*, 2023 WL 6443924, at *8; *Barwicks*, 2024 WL 1521473, at *9. As the Government points out, while the English statute permitted Catholics to retain their arms if they swore an oath of allegiance, § 922(g)(1) contains a similar restorative provision allowing for the restoration of the right to keep arms under certain circumstances, such as expungement or pardon. (Dkt. 27 at 26) (citing 18 U.S.C. §§ 921(a)(20) and 925(c); *Atkinson*, 70 F.4th at 1036 (Wood, J.,

dissenting) (writing that "relief from disability is possible through executive clemency")); *see also United States v. King*, 2023 WL 7936754, at *1 (N.D. Ill. Nov. 17, 2023) ("[A] felon today [may] regain his right to possess firearms even after that right has been restricted under § 922(g)(1), specifically through expungement or pardon."). As to Head's argument that the English law is distinguishable because it was targeted at sedition and insurrection, not simply a concern that Catholics would disobey the law, the Court disagrees. As the court in *Agee* observed, "[d]issidence and lawlessness are inextricably tied in this context, and the English law analogues are relevant precursors to the felon dispossession statute today," because the English laws, "though aimed at political (or religious) dissident groups, stemmed from a distrust of those groups to obey the rule of law (or sovereign)." *See* 2023 WL 6443924, at *8. Again, *Bruen* requires not a historical twin, but a relevant analogue. The Court agrees that the seventeenth-century English laws cited by the Government are relevant analogues to the felon dispossession statute, because they disarmed groups "based on their perceived potential disobedience to the law (or sovereign)." *See id.* ("[T]he analogues evince a solid pattern of dispossessing groups of persons deemed to be legally disobedient (or at risk of being so)[.]"); *see also Barwicks*, 2024 WL 1521473, at *9 (same) (quoting *Agee*, 2023 WL 6443924, at *8.)[7]

Next, the Government points to dispossession regulations from Colonial-era America that targeted Native Americans and enslaved Black people as analogues to § 922(g)(1). (Dkt. 27 at 29 n.13) (citing to a number of laws from the seventeenth and eighteenth century targeted at disarming these groups). The Court first observes that the historical analysis required by *Bruen* requires this

---

[7] While the court in *Barwicks* agreed with *Agee* that the English laws were relevant analogues, the *Barwicks* court went on to state that it was affording those laws "minimal weight because the Government cites laws that existed in Seventeenth-century England, but none that existed up to the adoption of the Second Amendment in 1791." *Barwicks*, 2024 WL 1521473, at *9. The Court here finds it unnecessary to decide the exact weight to be afforded each analogue in isolation, as the Court ultimately concludes that the Government's evidence, in total, justifies § 922(g)(1).

Court to directly confront our Nation's history, even those aspects that this Court finds odious. Reliance on laws disarming Black Americans as evidence of a historical tradition disarming "untrustworthy adherents to the law," in the context of a case involving a Black American like Head, is offensive, but such is the historical inquiry with which this Court is tasked. *See Washington*, 2023 WL 8258654, at *6 ("[T]he Court would be remiss in failing to point out that the government's characterization of Washington, a Black man, as an 'untrustworthy adherent to the law' would have been the same characterization the founders had about the enslaved Africans."). And of course, the laws relied on by the Government are not only bigoted but also would not survive constitutional challenges today. *See Barwicks*, 2024 WL 1521473, at *10; *Jackson*, 2023 WL 7160921, at *6 ("as several of the courts that have considered such laws in this context have been quick to underscore, many of the categorical restrictions in the historical record would not survive constitutional scrutiny today").

Notwithstanding their racially-biased underpinnings, these Colonial-era laws are applicable historical analogues, and the Court finds they evidence, as the Government contends, a historical tradition of firearms regulations disarming groups that were deemed likely to disobey the law. As disturbing as it is to seek support from laws grounded in racism or prejudicial beliefs about the trustworthiness of certain groups, *Bruen* expressly dictates that district courts examine historical regulations from the pre-Founding era to determine the historical understanding of the Second Amendment's scope. *See Jackson*, 2023 WL 7160921, at *6 ("There is no question that an analysis that relies on laws grounded in race-based prejudice or similarly deplorable stereotypes is intuitively uncomfortable. But *Bruen* directs courts to examine historical analogues to determine the historical understanding of the right to keep and bear arms.") (cleaned up). As the court in *Jackson* observed, "laws disarming enslaved people, religious minorities, and Native Americans—

however repulsive to modern sensibilities—fit that bill." *Id.* While it is obviously true that these laws would not pass constitutional review under the Fourteenth Amendment today and are abhorrent to our modern society, *Bruen* requires that the Court consider historical evidence from this exact period of time, decades if not hundreds of years before the Civil War and the passage of the Reconstruction Amendments. *Agee*, 2023 WL 6443924, at *8 ("Ultimately, whether the historical analogues presented would pass constitutional muster today (especially under other amendments) is aside from the *Bruen* inquiry."). In so doing, the Court agrees that these laws are relevant historical analogues to § 922(g)(1). In other words, the laws demonstrate that "[b]y the time of the Second Amendment's ratification in 1791, there already was a historical tradition of legislatures disarming persons based on the perception (sometimes odious perceptions) that certain groups could not be trusted to abide [by] the law or sovereign." *Id.* at *7.[8]

Oher persuasive historical analogues include Colonial-era laws that allowed the colonies to disarm persons, including "free, Christian, white men," "whom the authorities believed could not be trusted to obey the law." (Dkt. 27 at 30) (citing *Range*, 69 F.4th at 122 (Krause, J., dissenting)). For example, the Government cites to the Massachusetts government disarming the supporters of a particular outspoken preacher in the 1630s because "the authorities concluded their conduct evinced a willingness to disobey the law." (*Id.*) (citations omitted); *see also Range*, 69 F.4th at 123 (Krause, J., dissenting) (citing Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637–38, 644, 648 (1937)). The Government also cites to a number of laws in effect during the Revolutionary War that disarmed individuals who failed to demonstrate loyalty or swear allegiance to the burgeoning American government. (Dkt. 27 at 31–

---

[8] As the *Agee* court noted, this answers the third question from *Atkinson*, whether there are "broader historical analogues to § 922(g)(1) during the periods that *Bruen* emphasized, including, but not limited to, laws disarming 'dangerous' groups other than felons[.]" *Atkinson*, 70 F.4th at 1024.

32) (citations omitted); *see Agee*, 2023 WL 6443924, at *9 (noting that "at least six of the original 13 colonies enacted this type of legislation" demanding loyalty oaths); *Atkinson*, 70 F.4th at 1034 (Wood, J., dissenting) ("During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons who refused to swear an oath of allegiance to the state or to the United States.").

The Court finds these Colonial and Revolutionary-era laws are persuasive analogues to § 922(g)(1), in that they demonstrate that the colonies regularly disarmed groups who they believed would disobey the law. *See Agee*, 2023 WL 6443924, at *9; *see also Jackson*, 2023 WL 7160921, at *7 ("[T]he broader principle that emerges from the historical record is that 'since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament based on the danger they pose to the political community if armed.") (citing *Atkinson*, 70 F.4th at 1034) (Wood, J., dissenting).[9] Head takes issue with these examples as inapplicable because they allowed individuals to regain their rights through the swearing of a loyalty oath, and were justified by different considerations, such as the wartime need to suppress loyalists who might rebel or undermine the government. (Dkt. 29 at 30–31.) But the Court rejects Head's points of distinction for the same reasons discussed above: § 922(g)(1) does in fact allow felons to regain their rights under certain circumstances, *Barwicks*, 2024 WL 1521473 at *11, and the Court finds no meaningful distinction between laws justified by mistrust of political dissidents and those targeted at groups believed to be untrustworthy adherents of the law. *See Agee*, 2023 WL 6443924, at *8. Again, the Government need not present identical historical twins. The Court thus finds these laws further evidence a historical tradition of laws disarming groups that

---

[9] As the court in *Agee* noted, this analysis addresses *Atkinson's* fourth question: whether the historical analogues "supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)[.]" *Atkinson*, 70 F.4th at 1024.

governments believed (rightly or wrongly) would not obey the law.

As a final piece of evidence for this first category of analogues, the Government cites to the Constitution ratification debates as evidence that the Founders understood the right to bear arms as "compatible with broad legislative authority to disarm groups who could not be trusted to follow the law." (Dkt. 27 at 33.) For example, the Government cites to the Pennsylvania ratifying convention in 1787, and the Antifederalists' proposed constitutional amendment that explicitly recognized criminal activity as a ground for disarmament. 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627, 628 (1971) (proposed amendment provided right to bear arms "unless for crimes committed, or real danger of public injury[]"). And at the Massachusetts convention, founding father Samuel Adams proposed an amendment providing that the Constitution shall "never [be] construed . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." *Id.* at 675, 681, 758, 761 (emphasis added). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." *Id.* at 758, 761 (emphasis added). According to the Government, these proposals evidence a historical tradition of broad legislative power to disarm people who fell outside the trustworthy, law-abiding citizenry.

It is of course true, as Head notes, that the eventual Second Amendment as adopted did not include these proposals nor explicitly include the dispossession of firearms based on the commission of a crime. But as other courts have observed, the existence of these proposals does support the proposition that it was "'obvious' to the Founders that persons who committed crimes would properly be subject to disarmament laws." *Agee*, 2023 WL 6443924, at *9 (citing Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008)) (explaining that the Founders "did not object to the lack of an explicit exclusion of criminals from

the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood"); *Barwicks*, 2024 WL 1521473 at * 12 (same). The Supreme Court held in *Heller*, and later reaffirmed in *Bruen*, that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." 597 U.S. at 34 (emphasis in original). Moreover, the second inquiry outlined in *Atkinson* directs courts to examine the relevance of "proposals emerging from the states' constitutional ratifying conventions." 70 F.4th at 1023.

In sum, the Court finds that the Government's historical analogues of disarmament laws provide persuasive evidence of a historical tradition of firearms dispossession for those believed to be non-law-abiding persons, which is an appropriate analogy for firearm dispossession in the modern era under § 922(g)(1).

2. Criminal Punishments

The second category of historical analogues pointed to by the Government are the sweeping criminal punishments historically authorized against convicted felons. (Dkt. 27 at 35–39.) In the period leading up to the Colonial era, English law authorized capital punishment and estate forfeiture for convicted felons. *See* 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769) (defining a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded"). The Government notes that these punishments for felonies carried forward into the American colonies (and then the states) up to the time of the Founding. (Dkt. 27 at 35–39) (collecting sources); *see Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). The First Congress—which drafted and proposed the Second Amendment—made a variety of felonies

27

punishable by death, including not only offenses like treason, murder on federal land, and piracy on the high seas, but also nonviolent conduct. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). And States in the early Republic continued to treat felonies, including nonviolent felonies, as punishable by capital punishment or estate forfeiture. *See Agee*, 2023 WL 6443924, at \*10 ("The imposition of capital punishment or forfeiture for felonies persisted during the early Republic here in America and were not limited to overtly violent crimes.") (collecting sources); *see Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) ("[A]t the time of the Second Amendment's ratification, nonviolent crimes such as forgery and horse theft were capital offenses.").

On review of these sources, this Court agrees with the observation of the court in *Agee* that "[a]s a matter of logic and experience, it makes sense that these extensive and exhaustive penalties for felonies—outright capital punishment and the forfeiture of all property—qualify as powerful evidence that mere firearms dispossession of felons is a 'comparable burden,' as *Bruen* frames the standard." *See Agee*, 2023 WL 6443924, at \*10 (citing *Medina*, 913 F.3d at 158) ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."). Put another way, the Court agrees with the Government that "the existence of laws subjecting felons to blanket penalties necessarily encompassing but not limited to disarmament . . . demonstrate that certain groups of individuals falling outside of the law-abiding citizenry faced permanent disarmament." (Dkt. 27 at 46–47.)

Head counters in reply that the historical existence of capital punishment for felons cannot support the Government's authority to deprive felons of fundamental constitutional rights today, because such a rule would swallow other fundamental rights such as those protected by the First

28

Amendment or Due Process Clause. (Dkt. 29 at 34–35) (citing *Trop v. Dulles*, 356 U.S. 86, 99 (1958)) ("[T]he existence of the death penalty is not a license to the Government to devise any punishment short of death within the limit of its imagination."); *Kanter*, 919 F.3d at 461–62 (Barrett, J., dissenting) ("We wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding. The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society."). The Court agrees that the existence of the death penalty is not, *on its own*, dispositive proof of the historical understanding of the scope of fundamental rights. But that does not mean that history of punishment is not still relevant evidence to the ultimate question of whether the Second Amendment, as originally understood, permits felon disarmament. Indeed, it should be noted that then-Judge Barrett, in her same dissent in *Kanter* repeatedly cited by Head, also recognized that "history does show that felons could be disqualified from exercising certain rights—like the rights to vote and serve on juries—because these rights belonged only to virtuous citizens." *Id.* at 461 (Barrett, J., dissenting). In other words, the Nation's historical treatment of felons as a group, including punishments imposed and restrictions on fundamental rights, are relevant considerations in the Court's historical analysis. Thus, while the history of capital punishment for felons, including for nonviolent offenses, may not resolve the question of the historical scope of the Second Amendment, that history, like other historical limitations on felons' rights, supports the Government's contention that the restriction imposed on felons by § 922(g)(1) is consistent with this Nation's history.

In sum then, the Court finds, as have a majority of courts in the Seventh Circuit and across the country, that § 922(g)(1) survives constitutional review at step two of *Bruen*, because it is

"consistent with the Nation's historical tradition of firearm regulation" and "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 597 U.S. at 17, 19, 24.

### IV. As-Applied Challenge

One final issue needs to be addressed. As noted *supra* at note 2, it is unclear from Head's briefing whether he intends to raise both an as-applied and facial challenge to § 922(g)(1). Head argues the Court should find the statute unconstitutional on its face, and his arguments with respect to the historical analogues offered by the Government all concern the constitutionality of § 922(g)(1) on its face. He also, however, separately suggests at several points that the Government has failed to establish the constitutionality of the statue as applied to Head in particular. (*See* Dkt. 21 at 5, 15; Dkt. 29 at 36.). As the Government points out, Head does not explain why § 922(g)(1) should not apply to him specifically but should continue to apply to others. (Dkt. 27 at 49.) Nor does Head cite to any legal authorities in support of an as-applied challenge based on his particular circumstances. If Head intended to bring an as-applied challenge then, the Court could dismiss it out of hand for failure to develop it. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).").

Regardless, for the sake of completeness, the Court rejects any as-applied challenge from Head to the extent he intends to raise one. The fifth question under *Atkinson* asks lower courts to examine whether there is historical support for individualized assessment of the Second Amendment protection based on the nature of the particular felony convictions at issue. *See* 70 F.4th at 1024. But Head has not pointed to any historical evidence for individualized assessments or carveouts for individuals with his particular felony convictions—aggravated domestic battery,

30

possession of a firearm by a convicted felon, mob action, and drug manufacturing and distribution. Rather, as discussed above, the historical record supports the Government's authority to disarm groups based on a broader belief that they are untrustworthy adherents to the law, not because they were at risk of committing a particular crime. *See, e.g. Barwicks*, 2024 WL 1521473 at *14; *Agee*, 2023 WL 6443924 at * 12 ("[T]he historical analogues provided by the government support a legislative authority to disarm persons convicted of felonies, regardless of whether the conviction involved a use (or attempted use) of force.").

Further, even if there were room for individualized assessments, this would not help Head given the Seventh Circuit's recent ruling in *Gay*. As noted above, the Seventh Circuit assumed felons could bring an as-applied challenge to a § 922(g)(1) conviction, but rejected the challenge in Gay's case because of his multiple felony convictions, including for some violent offenses, and the fact that he was on parole when arrested with a weapon. *Gay*, 98 F.4th at 847. Here, Head has multiple felony convictions, including crimes involving violence and the use of force as well as the unauthorized possession of a firearm, and further he was apparently on parole, like Gay, when he was arrested for the instant offense. (Dkt. 31 at 3.) Thus, to the extent there is even room for an as-applied challenges to § 922(g)(1), Head's circumstances indicate he cannot maintain such a challenge.

## Conclusion

For all the foregoing reasons, Head's motion to dismiss is denied.

ENTERED: 5/21/24

_____
Nancy L. Maldonado
United States District Court Judge